**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DARNELL WASHINGTON,

     Plaintiff,

v.

OFFICER ANDREW NICCUM,
OFFICER CHRISTOPHER COCHRAN,
OFFICER JACOB VAPORIS,
DETECTIVE FRANK CAPOLUNGO,
CITY AND COUNTY OF DENVER.

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW, Plaintiff Darnell Washington, by and through his counsel Cheryl Trine of Trine Law Firm LLC, Chad Atkins of Atkins Law, and Mark Andrews of Andrews Law Firm, and alleges and complains as follows:

**<u>INTRODUCTION</u>**

1.     This is an action for damages and attorney's fees and costs, for the violation of Darnell Washington's constitutional rights when Denver Police Department ("DPD") officers used unreasonable force in seizing him, knocking him unconscious and breaking his leg at the knee. Darnell Washington is a black man and all the officers are white. On February 21, 2022, DPD officers attempted to stop Mr. Washington for failing to have a license plate on the front of his car, but he refused to stop and eventually ran from officers. He was unarmed. In arresting him, DPD officer Andrew Niccum used a "flying knee" to

Mr. Washington's head, knocking him consciousness. When Mr. Washington was lying prone on his stomach with his hands restrained behind his back and not resisting, Officer Niccum used his knees to fall on Mr. Washington's outstretched and immobile leg, breaking his leg at the knee. Another officer was at Mr. Washington's feet but not actively restraining his legs because Mr. Washington was not resisting. Officer Niccum's actions were caught on body camera footage. Mr. Washington immediately cried out in pain, saying "Ahhhhh! My knee!" Officer Niccum remained kneeled on his broken leg. Mr. Washington continued to cry out in pain, saying "My knee! My knee!" He was then unable to walk on his right knee. The other Defendant officers were present and knew of Officer Niccum's actions, but failed to intervene to stop him. They instead concealed Officer Niccum's use of gratuitous violence. The City and County of Denver has a widespread custom of allowing officers including Andrew Niccum to use unreasonable force in effecting arrests without taking any disciplinary action. After breaking Mr. Washington's leg, Officer Niccum is caught on video grinning and laughing as he says, "He's into oblivion!"

## JURISDICTION

2.      This action arises under Title 42 U.S.C. §§ 1983 and 1988, and the Fourth Amendment to the Constitution of the United States. Jurisdiction is conferred pursuant to 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction to consider state causes of action under 28 U.S.C.A. §1367, for ancillary state claims which "form part of the same case or controversy" as other counts for which this Court has established jurisdiction.

**VENUE**

4.      Venue properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

**PARTIES**

5.      Plaintiff Darnell Washington, is a resident of the state of Colorado, and a citizen of the United States.

6.      Defendant City and County of Denver ("Denver") is a Colorado municipal corporation, and is the legal entity responsible for itself and for the DPD. Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department. At all relevant times, Denver was the employer of Defendants Niccum, Cochran, Vaporis, Capolungo. Denver had a duty to enact and enforce constitutionally-adequate policies, procedures, customs, and practices; and to adequately train, supervise, and discipline its employees to ensure they uphold the constitutional rights of people they interact with, including Plaintiff Darnell Washington.

7.      Defendant Officer Andrew Niccum is a resident of Colorado and a citizen of the United States. At all relevant times, Defendant Niccum was acting under color of state law in his capacity as a law enforcement officer employed by Denver.  At all times relevant, he was acting within the course and scope of his employment with Denver.

8.      Defendant Officer Christopher Cochran is a resident of Colorado and a citizen of the United States. At all relevant times, Defendant Cochran was acting under

color of state law in his capacity as a law enforcement officer employed by Denver.  At all times relevant, he was acting within the course and scope of his employment with Denver.

9.      Defendant Officer Jacob Vaporis is a resident of Colorado and a citizen of the United States. At all relevant times, Defendant Vaporis was acting under color of state law in his capacity as a law enforcement officer employed by Denver.  At all times relevant, he was acting within the course and scope of his employment with Denver.

10.     Defendant Officer Frank Capolungo is a resident of Colorado and a citizen of the United States. At all relevant times, Defendant Capolungo was acting under color of state law in his capacity as a law enforcement officer employed by Denver.  At all times relevant, he was acting within the course and scope of his employment with Denver.

## **FACTUAL ALLEGATIONS**

**A. Defendant Niccum Used Excessive Force, and Defendants Cochran, Vaporis, and Capolungo Failed to Intervene and Concealed Evidence of that Use of Excessive Force.**

11.     Defendant Niccum and DPD Officer Danielson were driving a DPD patrol car on February 21, 2022.

12.     Officer Niccum wrote in his statement that they attempted to stop Plaintiff Washington because his car did not have a front license plate.

13.     Plaintiff Darnell Washington was a 37-year-old black man.  The Defendants are all white men.

14.     Defendant Niccum wrote in his report that Mr. Washington did not speed, but when he refused to stop, he and Officer Danielson stopped following him.

15.     An unmarked police car driven by Defendant Cochran instead allegedly followed Mr. Washington so that officers could arrest him when he stopped and exited his car.

16.     When Mr. Washington stopped his car, he allegedly ran from the vehicle into a nearby apartment building.

17.     Additional officers arrived. Two of those officers reported that they identified a man named Mack Lawrence as matching the description of the person they were hunting, but Mr. Lawrence stated he had been in his apartment all day.

18.     As the officers searched the apartment building, Defendant Vaporis reported in his statement that Mr. Washington allegedly jumped from a second story window and ran on foot.

19.     The defendant officers reported that they chased Mr. Washington for blocks, but could not catch up with him until the 1600 block Fulton Galena alleyway.

20.     Defendant Cochran reported that he caught up with Mr. Washington in the alley after Mr. Washington allegedly punched the owner of a car with his fist, causing a bloody lip.

21.     When Defendant Cochran ordered Mr. Washington to "get on the ground," Mr. Washington instead ran from him down the alley.

22.     Mr. Washington was wearing a short-sleeve white t-shirt and jeans.

23.     Mr. Washington did not have any weapons in his hands.

24.     At no time did Mr. Washington fight the police officers, or threaten them. Instead, he tried to flee from the officers.

25.     Mr. Washington ran for a few seconds from Officer Cochran in the alley until he got to a fence where he put his hands on the fence with his back to Defendant Cochran.

26.     Mr. Washington's empty hands were on the fence in clear view when Defendant Cochran grabbed him from behind.

27.     Defendant Cochran reported that Mr. Washington was attempting to jump the fence when he grabbed him from behind to stop him.

28.     Defendant Niccum was carrying a rifle.

29.     Defendant Niccum did not point the rifle at Mr. Washington at any time.

30.     Defendant Cochran had Mr. Washington in his grasp for 5 seconds when Defendant Niccum hit Mr. Washington in the left side of his head with a "flying knee."

31.     Defendant Niccum reported hitting Mr. Washington with a flying knee.

32.     Defendant Cochran later stated to other officers that Mr. Washington was knocked unconscious.  Defendant Cochran did not report this use of force. No officer reported that Mr. Washington had been knocked unconscious by a head strike to EMS.

33.     Mr. Washington fell to the ground on his back.

34.     Defendant Vaporis reported driving down the alley where he saw Defendants Cochran and Niccum on top of Mr. Washington while Mr. Washington was on his back.

35.     When he was given a command, Mr. Washington said, "yes sir."

36.     Three DPD officers (Defendants Cochran, Vaporis, and Capolungo) pinned Mr. Washington's arms and head, and rolled him over while moving his hands behind his back to be cuffed.

37.     Defendant Vaporis reported that he took control of Mr. Washington's wrists and flipped him onto his stomach, and then put him in handcuffs.

38.     Defendant Capolungo reported seeing Mr. Washington taken to the ground and then controlling his left arm until he was cuffed.

39.     A fifth DPD officer was at Mr. Washington's feet.  He was not holding his feet, but could have if it had been necessary to restrain Mr. Washington.

40.     Mr. Washington was not resisting while he was handcuffed.

41.     Defendant Niccum stood idly next to Mr. Washington's legs, waiting for him to be turned over onto his stomach to be cuffed.

42.     Body cam video shows Mr. Washington on his stomach not resisting, being cuffed by three officers around his upper body and one officer at his feet, when Defendant Niccum fell with his knees onto the back of Mr. Washington's right knee.

43.     The sound of Mr. Washington's bone breaking can be heard on the video.

44.     Mr. Washington cried out, "Ahhhhhh!  My knee!"

45.     This is the first time Mr. Washington complained about his knee.

46.     Defendant Niccum remained kneeled on Mr. Washington's leg, with his rifle pointed upwards to the sky.

47.     Defendant Niccum told Mr. Washington to "calm down" while Mr. Washington continued to cry out, saying "My knee! My knee!"

48.     Without missing a beat, Defendant Cochran said, "We need an ambulance Code 9."

49.     To the Denver Police Department, "ambulance Code 9" means urgent.

50.    Mr. Washington kept crying out, "my knee, my knee" as the Defendants moved him.

51.    Mr. Washington, who had outrun the officers for many blocks, could no longer walk on his right knee.

52.    Defendant Vaporis reported that he and Detective Capolungo put Mr. Washington into a patrol car.

53.    Laughing, Defendant Niccum said to Defendant Cochran, "He's into oblivion!"

54.    It was only after Mr. Washington was arrested that the Defendants discovered there was a warrant for his arrest for a parole violation.

55.    A supervisor, Lt. Porter arrived at the scene.

56.    Based on information and belief, Defendants Niccum, Cochran, Vaporis, and Capolungo frequently worked together investigating an area of town known for crime.

57.    Based on information and belief, Defendants Niccum, Cochran, Vaporis, and Capolungo knew that Defendant Niccum had a history of using excessive force, and specifically of using his knees to inflict excessive force.

58.    Defendants Cochran, Vaporis, and Capolungo were next to Defendant Niccum when he fell onto Mr. Washington's knee, causing him to cry out in pain, and they saw Defendant Niccum remain on Mr. Washington's injured knee while he cried out in pain, but they did not do anything to intervene to stop Defendant Niccum. Instead, they concealed his use of excessive force in their police reports.

59.     Based on information and belief, Lt. Porter also understood that Defendant Niccum injured Mr. Washington's leg by using unreasonable force in violation of Mr. Washington's constitutional rights because he reported that he watched the body camera video which shows the use of force, but he failed to take any supervisory or disciplinary action.

60.     Falk Ambulance transported Mr. Washington to University of Colorado Hospital in Aurora.

61.     At the hospital, it is noted that Mr. Washington suffered from altered mental status.

62.     Radiological studies of Mr. Washington's head, neck, chest, and leg were performed at the hospital.  A toxicology screen was not performed.

63.     Emergency Physician, Dr. Alex Ebinger diagnosed a tibial plateau fracture, which is an injury in which you break your bone and injure the cartilage that covers the top end of the tibia (bottom part of the knee).



64.     According to the Orthopedic Trauma Association, a tibial plateau fracture is very painful, and a person with the fracture would not be able to walk on it.

https://ota.org/for-patients/find-info-body-part/3834#/+/0/score,date_na_dt/desc/

65.     This is documented by Dr. Ebinger as a "serious bodily injury."

66.     Mr. Washington had follow-up care and physical therapy at Denver Health Medical Center for over a year.  It is noted he had early degenerative changes in his medial tibial femoral and patellofemoral compartments.

67.     A pre-existing bullet fragment is noted to be superficial and lateral to Mr. Washington's facture.

68.     The fracture is the cause of Mr. Washington's weakness, pain, and impairment.

69.     In August of 2022, Mr. Washington was still using a cane to ambulate until he fell on a slippery surface due to weakness in his injured leg, and then he was in a wheel chair. Prior to being in the wheelchair, the pain was worse with stairs and woke him up frequently at night. His goal was to walk with less pain.  The pain is at the fracture site.

70.     In June of 2023, Mr. Washington again received physical therapy for his knee, which was noted to still cause him pain. He reported that if he went up the stairs too frequently, he had to hop up the stairs on his left leg. He is noted to still have weakness and pain in his leg.

71.     Despite receiving medical care and physical therapy at Denver Health Medical Center for over a year, Mr. Washington has permanent knee pain, impairment, and right leg weakness from his tibial plateau fracture.

72.    Pursuant to DPD rules, Defendant Niccum was required to report his use of force to Mr. Washington's head and leg.

73.    Based on information and belief, Defendant Niccum did not report his use of force to Mr. Washington's head and knee.

74.    DPD has refused requests to disclose Defendant Niccum's Internal Affairs resume and his use of force reports.

75.    Based on information and belief, Defendant Niccum routinely uses excessive force during arrests, and this is well-known to officers who work with him, but they routinely do not intervene to stop him.

76.    Based on information and belief, the Defendants conspired to conceal Defendant Niccum's gratuitous and unreasonable use of force by reporting Mr. Washington "popped his knee out of joint" when he jumped from the second story apartment window, even though the injury was caught on body camera footage while they were all present right next to Defendant Niccum, and Mr. Washington did now complain about any knee pain and could outrun the officers until Defendant Niccum injured his knee, after which he could no longer walk on it.

**B. Denver Has a Widespread Custom of Officers Using Excessive Force and it Fails to Train, Supervise and Discipline Officers to Protect the Constitutional Rights of the Public.**

77.    Based on information and belief, Defendant Niccum previously employed excessive force against members of the public, and this was known to the officers who witnessed his use of excessive force against Mr. Washington.

78.    Based on information and belief, Defendant Niccum was not appropriately supervised and disciplined by Denver for his previous uses of excessive force.

79.     Based on information and belief, it is well known to the DPD and Denver that Officer Niccum routinely uses excessive force in making arrests, and DPD officers including the Defendant Officers routinely fail to report, misreport, or conceal facts concerning his use of excessive force with the blessing of supervisors who are aware of his use of force from body camera video.

80.     Defendant Denver has developed a longstanding and widespread custom, policy, procedure, and/or practice of excessive force through its failure to train, supervise, discipline, and terminate law enforcement officers with respect to uses of force and accurate reporting.

81.     The Defendant officers engaged in the acts and omissions described herein pursuant to the customs, policies, procedures, and/or practices of Denver, which encouraged, condoned, tolerated, and ratified the use of excessive force and deprivation of constitutionally protected rights of members of the public by law enforcement officers.

82.     When DPD officers have used excessive force, DPD has routinely condoned the behavior of its officers by failing to acknowledge excessive force to the public and failing to adequately discipline, retrain, and/or terminate those who engage in such misconduct.

83.     Defendant Denver's failure to adequately discipline or terminate officers who use excessive force has the foreseeable effect of emboldening those officers and others to disregard the constitutional rights of members of the public.

84.     The Denver Department of Safety oversees both the DPD and the Denver Sheriff's Department ("DSD"). Thus, the conduct of both the DPD and the DSD illustrate Defendant Denver's customs, patterns, and practices because accountability for the use of

excessive force resides ultimately with the Executive Director of the Denver Department of Safety.

85.     On December 16, 2020, DPD officers repeatedly punched Trevion McKenzie in the face when he was being handcuffed.  Based on information and belief, he was not resisting arrest.  DPD officers beat him so severely that he had an open orbital floor fracture and blow out fracture to his left eye socket. He had to undergo surgery to implant a plate, and he suffered permanent eye damage as a result. Based on information and belief, none of the officers involved were retrained or disciplined.

86.     On November 4, 2020, DPD officers fired projectiles at peaceful protestors including Stacie Lorraine Grant and Ariel Wolff, causing them serious physical injuries.  They are among the many peaceful protestors injured by DPD officers in 2020.

87.     On March 20, 2019, DSD deputies punched Serafin Finn in the face when he was already handcuffed and shackled in a wheelchair, and then tipped the wheelchair backwards so that he struck his head on the pavement. Neither of the officers involved was retrained or disciplined.

88.     On June 3, 2016, a DPD officer tased Gregory Heard and shoved his face into the dirt while he was unarmed and complying with the officer's commands to surrender. DPD officers then prepared false police reports to cover up the use of excessive force, asserting that Mr. Heard was disobeying their commands and threatening the officers when he complied with instructions to come out from behind bushes. None of the officers involved was retrained or disciplined.

89.     On November 11, 2015, DSD deputies killed Michael Marshall, who was pacing around in a mental health emergency, by tackling and piling on top of him,

causing him to vomit, and then putting a spit mask over his mouth after he had

asphyxiated and gone into cardiac arrest. An autopsy showed he died from complications

from positional asphyxia and suffered multiple blunt force injuries to his face, chest,

back, and extremities. Denver paid $4,650,000 to settle with his family but the deputies

involved received little to no discipline for their violation of his constitutional rights.

90.     In October of 2015, a federal jury returned a $400,000 verdict in favor of a

man beaten by a DPD officer. On May 22, 2012, a DPD officer assaulted a 77-year-old

blind man, Philip White, for not leaving the Greyhound bus station while waiting for his

bus. The DPD officer slammed Mr. White's head into a ticket counter, causing a bloody

gash, and applied overly tight handcuffs to his wrists. Mr. White had not committed any

crime. Denver IAB found that the DPD officer neither violated department policy nor

used excessive force on Mr. White. The officer was not retrained or disciplined by

Denver.

91.     In July of 2014, a DPD officer violently assaulted Brandon Schreiber at a

bar in Denver, tearing both of his rotator cuffs when video shows he had his hands in his

pockets and was not making threatening gestures to the officer or committing any crime.

The officer had eighteen prior complaints of excessive force, but had never been

disciplined for any of them.

92.     On January 12, 2011, a father and his three sons filed a lawsuit for

excessive force during a warrantless raid on their home based on outdated information

about the house's previous tenants. One DPD officer slammed Jonathan Martinez's head

through a window, pulled hm outside the house and slammed him onto the concrete to

apply handcuffs. A second pushed Daniel Martinez and a third punched Nathan Martinez

in the face without provocation or threat. A fourth officer dragged Daniel Martinez III from the house and slammed him into the concrete before applying handcuffs. The DPD officers attempted to conceal their use of force by charging the Martinez family members with assaulting the officers, but the charges were dismissed against two and a jury acquitted Nathan Martinez and Daniel Martinez III of all charges. In September of 2014, a federal jury awarded the Martinez family $1,800,000 for the DPD officers' excessive force.

93.     On January 11, 2011, Alexander Landau filed a lawsuit for an assault by DPD officers during a routine traffic stop when he asked if they had a warrant to search the trunk of his car. The officers beat Mr. Landau in the face and head with their fists, radio, and flashlight, and spewed racial epithets at him (he is black). He was transported to the hospital by ambulance with multiple injuries including a brain hematoma and concussion. The DPD officers filed false reports about the incident, and Denver ultimately paid Mr. Landau a $795,000 excessive-force settlement. However, none of the DPD officers involved was disciplined, either for assaulting Mr. Landau or for lying.

94.     On September 20, 2010, Rohit Mukherjee filed a lawsuit based on an assault committed on him by several DPD officers while he was hosting a party in his apartment. The officers responded to a noise complaint and asked him to step outside. When he refused, one officer pushed his way into the apartment and another pinned Mr. Mukherjee against the door and choked him, then threw him to the ground face first. After restraining Mr. Mukherjee, the officers stood on his ankle, kneed him in the head, and bent his fingers backwards, then hit his head against the walls while walking him out. When an officer noticed the guests were taking photos and videos, the officer confiscated

their cell phones and put them in a bowl of water to destroy the evidence. Denver paid Mr. Mukherjee to settle his lawsuit for excessive force.

95.     In June of 2010, Tyler Mustard filed a lawsuit for excessive force after two DPD officers beat him in the head, neck, and body, causing head injuries and a collapsed lung. They then charged him with spray-painting a van and assaulting an officer, but those charges were dismissed. Denver settled Mr. Mustard's lawsuit for $117,500.

96.     On March 16, 2010, Mark Ashford was walking his dogs when he witnessed DPD officers pull over a driver for allegedly failing to stop at a stop sign. When Mr. Ashford informed the driver that he as willing to testify that he saw the driver come to a complete stop at the stop sign and began to photograph the scene, the DPD officers beat him so badly he had to be transferred by ambulance to the hospital. The DPD officers charged Mr. Ashford with interference and resistance, but the charges were dismissed. Denver paid Mr. Ashford to settle his lawsuit in June of 2011.

97.     On July 9, 2010, five DSD deputies killed Marvin Booker in the booking area of the Van Cise-Simonet Detention Center by tasing him for a prolonged time when he was already restrained, and then attempted to cover it up by meeting to coordinate their stories and hiding the taser used to kill him. In October of 2014, a federal jury returned a verdict of $4.65 million against Defendant Denver and the DSD defendants. Denver later settled for $6 million including attorney fees but Defendant Denver never disciplined any of the DSD deputies. Instead, Denver continued to insist that everything done to Mr. Booker was standard operating procedure. During the litigation, Denver stipulated that its deputies' conduct was pursuant to Denver's customs, policies, and

practices, and a finding of liability against any individual defendant would be a finding of liability against Denver.

98.     On October 16, 2009, Wayne C. Rose filed a lawsuit for excessive force after a DPD detective and DPD officers beat and kicked him while he was unconscious and handcuffed following a police foot chase. His injuries included a broken arm that required multiple surgeries. Denver paid him to settle the lawsuit.

99.     On October 19, 2009, two DPD officers beat and maced four women, Kelly Boren, Sharelle Thomas, Ana Ortega, and Kristal Carrillo, outside The Denver Diner. The officers were called because one of the women had been the victim of an assault in the diner's bathroom. None of the women had committed any crime or were accused of any crime. The DPD maced them all and then further brutalized two of them while they were handcuffed. Denver paid $360,000 to settle their claims.

100.     In January of 2009, Denver paid Trudy Trout $100,000 to settle a lawsuit after a DPD officer shoved her to the ground, breaking her wrist. The officer then lied on his report about the incident, stating Ms. Trout tripped over her own shoes, which was contradicted by video evidence. The officer was not discipline for the use of force or for lying in his report.

101.     In September of 2009, Denver settled a lawsuit by the family of Alberto Romero, who died after being repeatedly tased and beaten with impact weapons by DPD officers because it was reported he was disturbing the peace when he was having an apparent mental health crisis.

102.     In 2008, Denver paid Juan Vasquez $885,000 to settle his lawsuit for excessive force against him when three DPD officers chased him on foot and when they

caught him, one officer used a fence as leverage to <u>jump up and down on the 16-year-old's back while he lay prone on the pavement</u>. The attack left the boy with a lacerated liver, kidney damage, and broken ribs.

103.    On August 11, 2006, Chandler Lyles filed a lawsuit because a DPD officer, in responding to a report that Mr. Lyles' mother was suicidal, forced Mr. Lyles to the ground and handcuffed him, and then <u>struck him in the back with his knee</u> while yanking his handcuffed arms up, which broke his clavicle. Denver settled his lawsuit.

104.    The above instances are but a sample of the many lawsuits filed for excessive force against DPD officers and Denver, for which Denver failed to make changes to its policies, procedures, custom or practices, and failed to retrain or discipline or terminate the offending officers.

105.    Defendant Denver knew or had constructive knowledge, based on its history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would utilize excessive and unnecessary force against people like Mr. Washington.

106.    Because Defendant Denver created and tolerate a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise DPD officers in these areas, citizens, including Mr. Washington, have repeatedly been subjected to violations of their constitutional rights.

107.    Given the DPD's history and widespread practice of officers using excessive force, Defendant Denver knew of the need to provide additional or better training and supervision and discipline in this respect, and made a deliberate choice to not adequately train and supervise and discipline DPD officers in avoiding excessive force.

108.    Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of failing to provide additional or better training, supervision, and discipline to DPD officers regarding how to avoid excessive force.

109.    Defendant Denver was deliberately indifferent to Plaintiff's constitutional rights because Denver knew that individuals in Mr. Washington's position would be at a substantial risk of suffering serious harm from its failure to properly train and supervise its employees.

110.    Defendant Denver could have and should have pursued reasonable methods for training, supervision, and discipline of such employees, but intentionally chose not to do so.

111.    Defendant Denver's policy of failing to act in the face of a history of excessive force against people, and its custom, policy, and practice of failing to properly train, supervise, and discipline its employees despite such history and constructive knowledge of such history, were the moving force and proximate cause of Defendant Niccum's use of excessive force and the failure of the other Defendants to intervene and instead to conceal Defendant Niccum's use of excessive force.

112.    The acts or omissions of each Defendant, including Denver's unconstitutional policies, procedures, customs and/or practices described herein, are the legal and proximate cause of Mr. Washington's injuries and damages, including but not limited to past and future medical and rehabilitation expenses, permanent impairment,

and past and future physical and mental pain and suffering, humiliation, fear, anxiety, loss of enjoyment of life and sense of security, and emotional distress.

## FIRST CLAIM FOR RELIEF

**(Section 1983 Excessive Force in Violation of the Fourth Amendment Against Defendants Niccum, Cochran, Vaporis, and Capolungo)**

113.    All of the above allegations are incorporated herein by reference.

114.    At all times relevant, Defendants were acting under color of state law in their capacity as DPD officers, and within the scope of their employment.

115.    At the time when Mr. Washington was seized, he had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

116.    The Defendants are not entitled to qualified immunity. Any reasonable law enforcement officer knew or should have known of this clearly established right.

117.    At all times relevant, Defendant Niccum had a duty to use only that amount of force objectively reasonable in light of the circumstances confronting him.

118.    At all times relevant, Defendants Cochran, Vaporis, and Capolungo had a duty to intervene to stop an officer from using excessive force to seize a person, including Mr. Washington.

119.    At all times relevant, Defendants Niccum, Cochran, Vaporis, and Capolungo had a duty to accurately report Defendant Niccum's use of excessive force.

120.    At all relevant times, it was clearly established that law enforcement officers are prohibited from using more force than reasonably required to seize a suspect.

121.    At all relevant times, it was clearly established that law enforcement officers are required to accurately report each use of force incident.

122.     At all relevant times, it was clearly established that law enforcement officers are prohibited from manipulating evidence in a manner that conceals uses of excessive force.

123.     Based on information and belief, Defendant Niccum failed to report his use of force against Plaintiff Washington.

124.     Defendants Cochran, Vaporis, and Capolungo each knew about Defendant Niccum's use of force against Mr. Washington, but none of them reported it.

125.     Defendant Niccum's use of a "flying knee" to the head to knock out an unarmed man who was not a threat to the officers or the public, and his second use of a knee strike to the back of Mr. Washington's right knee while he was restrained and not resisting, which broke his leg at his knee, was greater force than was reasonably necessary to effectuate the seizure.

126.     Defendant Niccum's uses of force were objectively unreasonable in light of the circumstances confronting him, violating Mr. Washington's Fourth Amendment right to be free from an unreasonable seizure conducted by excessive force.

127.     Defendant Niccum's use of excessive force caused Mr. Washington extreme pain; knocked him unconscious and altered his mental state; broke his leg at the knee; and caused physical, mental, and emotional pain and suffering and distress.

128.     Based on information and belief, Defendants Cochran, Vaporis, and Capolungo knew that Defendant Niccum routinely used excessive force via knee strikes in seizing members of the public, including Mr. Washington.

129.     Defendant Cochran observed or had reason to know of Defendant Niccum's use of excessive force to Mr. Washington's head because Defendant Niccum reported that

he warned Defendant Cochran, who was holding Mr. Washington, and Defendant Cochran knew that Defendant Niccum used a "flying knee" to knock people unconscious previously, but Defendant Cochran did not intervene to stop his use of excessive force.

130.    Defendants Cochran, Vaporis, and Capolungo observed or had reason to know of Defendant Niccum's use of excessive force to Mr. Washington's leg because they were all crowded around Mr. Washington's body in the process of cuffing him while he was not resisting when Defendant Niccum broke Mr. Washington's leg, which they could hear breaking, and they knew that Mr. Washington immediately cried out in pain, saying "Ahhhhhh! My knee!" while Defendant Niccum remained on his leg.

131.    Defendants Cochran, Vaporis, and Capolungo each knew that Mr. Washington was being handcuffed without any resistance or attempts to flee when Defendant Niccum fell with his knees onto Mr. Washington's leg, causing the sound of a bone breaking and Mr. Washington to cry out in pain about his knee.

132.    A DPD officer was at Mr. Washington's feet and could easily have restrained his legs with his hands without any injury to Mr. Washington had any restraint been necessary.

133.    In case any of these Defendants missed seeing Defendant Niccum fall onto Mr. Washington's leg, they knew that he cried out in pain and continued crying out about his knee while Defendant Niccum remained kneeled on his knee, and they failed to intervene.

134.    Defendants Cochran, Vaporis, and Capolungo each knew that this use of force was not necessary to seize Mr. Washington and was therefore excessive and cruel.

135.    Defendant Cochran was present when Defendant Niccum used a "flying knee" to Mr. Washington's head, and yet he failed to intervene to instruct Defendant Niccum not to use excessive force, even after Defendant Niccum again used excessive force to break Mr. Washington's leg, causing Defendant Cochran to request an ambulance and to fabricate a different reason for Mr. Washington's leg injury.

136.    Defendants Cochran, Vaporis, and Capolungo had a realistic opportunity to intervene, including while Defendant Niccum remained kneeled on Mr. Washington's broken leg while Mr. Washington cried out in pain, saying "My knee! My knee!" Instead, each of these defendants chose to conceal the use of excessive force by falsely reporting that Mr. Washington hurt his knee when he jumped from a second story window without reporting Defendant Niccum's use of force to his knee and his head.

137.    Defendants Cochran, Vaporis, and Capolungo heard Defendant Niccum afterwards exclaim proudly with a big smile that Mr. Washington was "into oblivion!"  It is reasonable to infer that each officer knew that Defendant Niccum was referring to his uses of excessive force on Mr. Washington.

138.    Based on information and belief, the officers communicated with each other in order to report the same facts in each of their police reports, including a concerted effort to conceal Defendant Niccum's use of excessive force and to instead blame the knee injury on Mr. Washington's jump from a window in order to flee.

139.    At the time that Defendant Niccum broke Mr. Washington's tibial plateau, Mr. Washington posed no danger to law enforcement officers or others, and was not actively resisting arrest or attempting to evade arrest by flight.

140.    The actions of Defendants Niccum, Cochran, Vaporis, and Capolungo, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Washington's constitutionally protected rights.

141.    As a direct result of Defendants' unlawful actions as described above, Mr. Washington suffered actual physical, emotional, and economic injuries in an amount to be determined at trial.

142.    Mr. Washington has been and continues to be damaged by Defendant Niccum's use of excessive force, and Defendants Cochran, Vaporis, and Capolungo's failure to intervene to stop Defendant Niccum's use of his knees to cause unreasonable and unnecessary injury in order to put Mr. Washington "into oblivion" in the gleeful words of Defendant Niccum.

143.    As a direct result of each of the forgoing Defendants' excessive force, Plaintiff Darnell Washington was injured and damaged in the following particulars:

(a)    Non-economic damages consisting of past and future physical pain, suffering, anxiety, emotional distress, stress, fear, and loss of enjoyment of life;

(b)    Past and future medical, rehabilitation and other health care expenses for his physical injuries;

(d)    Permanent injuries including permanent knee pain and early arthritis caused by the bone fracture; and

(e)    Permanent impairment.

144.    Each Defendant's conduct was a direct cause in whole or in part of Mr. Washington's injuries and damages, which are indivisible, resulting in joint and several liability.

145.    The conduct of each of the Defendants was undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Washington's constitutionally protected rights entitling him to punitive or exemplary damages against each of the Defendants in their individual capacities under color of state law.

146.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

## SECOND CLAIM FOR RELIEF

**(Section 1983 - Municipal Liability Against Defendant City and County of Denver)**

147.    All of the above allegations are incorporated herein by reference.

148.    Defendant Denver failed to adequately train, supervise, discipline, and terminate its law enforcement officers. Under the factual circumstances regularly confronting DPD officers, Defendant Denver's failures amount to deliberate indifference with respect to the use of excessive force against members of the public.

149.    By its deliberate indifference, Defendant Denver approves, condones, and ratifies its law enforcement officers' use of excessive force, including the use of unreasonable force after a person is restrained and not attempting to flee, and with no purpose other than to injure the arrestee.

150.    Using force against persons being arrested is a usual and recurring situation with which law enforcement officers must regularly deal, and it is foreseeable that officers will use unreasonable force if they are not properly trained, supervised, and disciplined.

151.    Defendant Denver has an unconstitutional custom, policy, procedure, and/or practice of unreasonable and excessive force in arresting people in Denver, which is the moving force behind Mr. Washington's injuries in whole or in part.

152.     Denver failed to adequately train, supervise, discipline, and terminate Defendant Niccum in this case, as well as other employees to avoid the use of excessive force in effecting seizures of persons, which failure contributed to a culture of tolerating excessive force by Denver's law enforcement officers and supevisors.

153.     Denver was deliberately indifferent to the constitutional rights of its citizens in failing to adequately train, supervise, discipline, and terminate its officers to avoid the use of excessive force.

154.     Denver's conduct was a direct cause in whole or in part of Plaintiff Darnell Washington's injuries and damages, and Defendants are jointly and severally liable.

155.     As a direct result of the unconstitutional Denver City and County policies, procedures, practices, and widespread custom of excessive force and a failure to train, supervise, and discipline officers for committing excessive force, Mr. Washington was seriously injured and damaged as stated in Paragraph 143, s*upra*.

156.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

### **THIRD CLAIM FOR RELIEF**

**Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. Art. II, Section 7 – Excessive Force**
**(Against Defendants Niccum, Cochran, Vaporis, and Capolungo for damages, and Against Defendant Denver for Declaratory and/or Injunctive Relief)**

157.     All of the above allegations are incorporated herein by reference.

158.     At all relevant times, Defendants Niccum, Cochran, Vaporis, and Capolungo acted under color of state law and within the course and scope of their employment as a law enforcement officers.

159.    At all relevant times, Defendants Niccum, Cochran, Vaporis, and Capolungo were peace officers under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

160.    Plaintiff had a protected interest under Colorado Constitution, Article II, § 7 in being free from the use of excessive force by law enforcement personnel.

161.    Officer Niccum seized Plaintiff, who was unarmed, prone on the ground, restrained, and not resisting or attempting to flee, by means of unreasonable and excessive force, including but not limited to physical force to Plaintiff's knee resulting in his tibia breaking.

162.    Officer Niccum's use of force against Plaintiff, as described herein, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

163.    Defendants Cochran, Vaporis, and Capolungo engaged with Defendant Niccum in a collective plan or effort to use unreasonable and excessive force against Plaintiff, or alternatively, Defendants Cochran, Vaporis, and Capolungo failed to take reasonable steps to intervene in Defendant Niccum's use of unreasonable and excessive force against Plaintiff despite being in a position and having the opportunity to do so. Each is therefore liable for the damages resulting from the objectively unreasonable and excessive use of force against Plaintiff.

164.    Defendants Cochran, Vaporis, and Capolungo were aware of Defendant Niccum's custom of using his knees to inflict injuries, and they failed to intervene to stop him from doing so, and then they concealed his use of excessive force by fabricating a

reason for Plaintiff's knee injury without accurately reporting Defendant Niccum's use of excessive force.

164.      Defendant Cochran knew of Defendant Niccum's use of excessive force to Mr. Washington's head, but failed to intervene and concealed the use of excessive force from EMS and in his reporting.

166.      The Defendants concealed and condoned Defendant Niccum's use of excessive force, knowing that he used such force and would continue to use excessive force with the Defendant's complicit approval.

167.      Officers Niccum, Cochran, Vaporis, and Capolungo subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

168.      Officers Niccum, Cochran, Vaporis, and Capolungo did not act upon a good faith and reasonable belief that their actions were lawful in using unreasonable and excessive force against Plaintiff and/or failing to intervene to prevent such excessive force and then attempting to conceal it with a fabricated reason for Plaintiff's injuries.

169.      The use of excessive force and/or the failure to intervene to prevent such force by Officers Niccum, Cochran, Vaporis, and Capolungo is the proximate cause of Plaintiff's injuries and damages as described in Paragraph 143, *supra*.

170.      Defendant Officers Niccum, Cochran, Vaporis, and Capolungo's conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which the Defendants must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly Plaintiff.

171.    Plaintiff reserves the right to seek exemplary damages after sufficient discovery has been completed against Officers Niccum, Cochran, Vaporis, and Capolungo.

172.    Plaintiff seeks only declaratory and injunctive relief against Defendant Denver with this claim.

173.    Defendant Denver failed to create, implement, and/or enforce adequate policies; and it failed to reasonably train, supervise, and/or discipline DPD officers, including Officers Niccum, Cochran, Vaporis, and Capolungo, in issues relating to the use of excessive force, despite the obvious need to do so.

174.    Defendant Denver knew or should have known that the failure to create and implement such policies and to adequately train, supervise and discipline DPD officers in such issues relating to unlawful force was likely to harm individuals like Plaintiff; it was reasonably foreseeable that their failures in this area would cause the harm or a similar harm that Plaintiff has suffered and will continue to suffer.

175.    In failing to implement and/or enforce adequate policies and in failing to reasonably train, supervise and discipline DPD officers including Officers Niccum, Cochran, Vaporis, and Capolungo, in such issues relating to the use of force, Defendant Denver caused Plaintiff to be subjected to the deprivation of his right to be free from the use of excessive force by law enforcement officers, as guaranteed by the Colorado Constitution, article II, § 7.

176.    Defendant Denver's actions and omissions violated Plaintiff's state constitutional rights, and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

177.     Defendant Denver is liable for the acts and omissions of its agents and/or employees, and for the herein described acts by Defendant Officers Niccum, Cochran, Vaporis, and Capalungo, who were acting within the scope and course of their employment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against the Defendants in an amount which will fairly compensate Plaintiff Darnell Washington for all injuries and damages as heretofore set forth, together with pre-judgment and post-judgment interest, litigation costs including expert witness fees, attorney fees pursuant to § 1988, punitive or exemplary damages pursuant to §§ 1983 and 1988, and for declaratory relief and injunctive relief as appropriate, and for such other and further relief as the Court may deem just and equitable.

DATED this 5th day of February, 2024.

Respectfully submitted,

/s/ Cheryl Trine
Cheryl L. Trine, #38150
Trine Law Firm LLC
155 E. Boardwalk Drive #400
Fort Collins, CO 80525
Phone: 970-391-9442
Fax: 970-458-1800
Email: ctrine@trinelaw.net

Chad A. Atkins, #24459
Atkins Law
9249 South Broadway #200-138
Highlands Ranch, CO 80129
Phone: 303-667-0528
Email: Seeatkins@comcast.net

Mark H. Andrews, #39709
Andrews Law Firm
600 17th Street, Suite 2800 South
Denver, CO 80202
Phone: 303-861-1500
Email: mark@andrewslawfirm.org

## PLAINTIFF DEMANDS A JURY TRIAL TO A JURY OF SIX.

Plaintiffs' Address:

Darnell Washington
Van-Cise Simonet Detention Center
490 West Colfax Avenue
Denver, CO 80204